**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x

AMERICAN RIGHTS MANAGEMENT
COMPANY LLC,

   Plaintiff,

   -  vs. –

VIACOM 18 US, INC.; VIACOM, INC.;
RELIANCE MEDIAWORKS USA, INC.
f/k/a ADLABS FILMS USA, INC.; STUDIO
18 USA., INC.; SAAVN, LLC; VIVA
ENTERTAINMENT, LLC; MTV INDIA
DEVELOPMENT COMPANY, INC., and
DOES 1-10,

   Defendants.

-------------------------------------------------------x

Case No.: 10 - civ - 3690

**COMPLAINT FOR**:

[1] **COPYRIGHT INFRINGEMENT**
  (17 U.S.C. §§ 101 ET SEQ.);
[2] **CONTRIBUTORY COPYRIGHT**
  **INFRINGEMENT**
[3] **VICARIOUS COPYRIGHT**
  **INFRINGEMENT**

**DEMAND FOR JURY TRIAL**

   Plaintiff, American Rights Management Company LLC (hereinafter "Plaintiff" and/or

"ARM"), by and through its attorneys of record, hereby alleges as follows:

<b>NATURE OF THIS ACTION</b>

   1.  Plaintiff brings this action to enforce Plaintiff's exclusive copyright rights.  This

case arises out of Defendants' exploitation of a motion picture entitled "*Singh is Kinng*"

(hereinafter "*SIK*" and/or the "infringing work"), which is derived from Plaintiff's copyrighted

work, an original short story by Damon Runyon entitled "*Madame La Gimp*" (hereinafter "the

*MLG* story")(attached hereto as Exhibit "A").  *SIK* is also derived from the film works "*Lady for*

*a Day*" (hereinafter the "*Lady for a Day*" film), "*Pocketful of Miracles*" (hereinafter "POM"),

and "*Miracles*" (collectively the "Derivative Films"), which are derivative of the *MLG* story and

distributed pursuant to grants of rights by Plaintiff.  Plaintiff is the copyright proprietor of the

copyrighted material embodied in the *MLG* story (attached hereto as Exhibit "B", Copyright

Registration). Defendants do not possess any derivative motion picture rights to the *MLG* story or, upon information and belief, to the Derivative Films.

2.    *SIK* copies the pattern, sequence, and the selection and combination of elements directly from the *MLG* story, and indirectly from the Derivative Films.

3.    The spontaneous reactions of ordinary observers and film critics who reviewed *SIK* demonstrate that Defendants copied, adapted, and/or remade the *MLG* story and the Derivative Films which embody the *MLG* story:

Amazon: "Speaking of that old woman, the plot takes time to borrow from Frank Capra's Lady for a Day." Review by H. Bala, October 22, 2008, Amazon.com.

Variety: "Obviously inspired by Frank Capra's A Pocketful of Miracles (1961) … and Jackie Chan's similarly plotted Miracles (1989)." Review by Joe Leydon, August 13, 2008, Variety.com.

New York Times: "Mr. Kumar shines as a Capraesque hero." Review by Rachel Saltz, Movie Critic, August 15, 2008, NewYorkTimes.com.

## JURISDICTION AND VENUE

4.    This is an action for copyright infringement and permanent injunctive relief under the United States Copyright Act, 17 U.S.C. §§ 101 et seq. (hereinafter, "the Copyright Act").

5.    This Court has original subject matter jurisdiction pursuant to the Copyright Act, 17 U.S.C. §101 et seq., 28 U.S.C. §1331 (federal question jurisdiction), and § 1338(a) and (b) (jurisdiction over copyright actions), and § 1332 as an action between citizens of different states with an amount in dispute exceeding $75,000.00.

6.    This Court has personal jurisdiction over the Defendants in that Defendants are conducting business in the State of New York and in this district, directly or through agents. See

N.Y. C.P.L.R. § 301. All Defendants have transacted business within the state of New York and contracted to supply goods or services in the state of New York in connection with the matters giving rise to this suit. Id. § 302(a)(1). Defendants have also committed infringing acts outside of New York causing injury to the Plaintiff in New York, and Defendants regularly do or solicit business in New York, and/or expect or reasonably should expect their infringing conduct to have consequences in New York, and Defendants derive substantial revenue from interstate commerce. Id. § 302(a)(3); N.Y.U.D.C. § 404.

7.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b) and (c) and/or 1400(a). Upon information and belief, each Defendant may be found in this district and/or has principal places of business in this district and/or a substantial part of the acts of infringement complained of herein occurs or has occurred in this district.

## PARTIES

8.     Plaintiff is the proprietor of the renewal copyright in the *MLG* story, and owns property in the State of New York, conducts business within this district in the State of New York, and has its principal place of business in the State of New York.

### I. The Viacom Defendants

9.     Upon information and belief, Defendant Viacom 18 US, Inc. (hereinafter "Viacom 18 US" or with others collectively "Defendants" and/or "Viacom Defendants") is a corporation organized and existing under the laws of the State of Delaware. Viacom 18 US is owned, and controlled by, and/or has equity interest owned by Viacom Inc., and it is registered to do business in, conducts business in this district in the State of New York; and Viacom 18 US is a wholly owned subsidiary of Defendant Viacom, Inc., which is registered to do business in, and

conducts business in, this district in the State of New York.

10.     Upon information and belief, Viacom 18 US is a distributing agent of the Indian Film Company, and is a U.S. distributor of *SIK*.

11.     Upon information and belief, Defendant Viacom, Inc. (hereinafter "Viacom" or with others collectively "Defendants" and/or "Viacom Defendants") is a corporation organized and existing under the laws of the State of Delaware, and it owns and controls, and/or has equity interest in Viacom 18, Studio 18, U.S.A. Inc., and other subsidiaries, affiliates, and/or distribution servicing and/or third party entities, including, but not limited to, Paramount Home Entertainment, Inc. and Viacom Global (Netherlands), B.V.; and Viacom has its principal place of business in this district in the State of New York.

12.     Upon information and belief, Defendant Studio 18 USA, Inc. (hereinafter "Studio 18" or with others collectively "Defendants" and/or "Viacom Defendants"), is a joint venture between Viacom and The Indian Film Company (hereinafter "IFC"), and is owned and controlled by Viacom, is a division of Viacom 18 U.S., which is registered to do business in, and conducts business in, this district in the State of New York.  Studio 18 was formed for the purpose of producing, financing, and distributing in international territories selected theatrical motion pictures which were developed, produced, manufactured, marketed in, and from, the United States.  Studio 18 is a distributing agent for M/S Block Buster Movie Entertainers.

13.     Upon information and belief, Studio 18 conducts business in this district in the State of New York directly and through Studio 18's owners, principals, and agents of the Viacom Defendants, and distributes Indian motion pictures pursuant to a distribution agreement. Studio 18 has common ownership with, and its activities are interrelated with those of, the Viacom Defendants, specifically Viacom.

14.     Upon information and belief, Saavn, LLC, (hereinafter referred to as "Saavn" or collectively with others "Defendants" and/or "Viacom Defendants") is a corporation organized and existing under the laws of the State of Delaware, has its principal place of business in New York, and conducts business in the State of New York.

15.     Upon information and belief, Saavn and IFC distributed *SIK* across Saavn's cable Video on Demand ("VOD") network in North America pursuant to a distribution agreement.

16.     Upon information and belief, Reliance MediaWorks (USA) Inc. f/k/a Adlabs Films USA Inc. (hereinafter "Adlabs U.S.A.") is a wholly owned subsidiary of Reliance MediaWorks, Ltd. f/k/a Adlabs Films, Ltd., and is registered to do business, and conducts business in the state of New York. Adlabs U.S.A. theatrically displayed SIK in some of its 240 theaters located in the United States, and has entered a partnership with ImaginAsian Entertainment, Inc. of New York to promote Pacific-Asian culture in America.

17.     Upon information and belief, Defendant MTV India Development Company, Inc.(hereinafter "MTV India" or with others collectively "Defendants" and/or "Viacom Defendants") is a corporation organized and existing under the laws of the State of Delaware, is an agent and subsidiary of Viacom, operates in association with the Viacom Defendants and conducts business in this district in the State of New York.

18.     Further, upon information and belief, Plaintiff alleges that MTV India is a distribution arm of the Viacom Defendants, and receives a share of the sales and/or profits from the domestic and international distribution of DVDs of the infringing work (*SIK*).

19.     Upon information and belief, Viva Entertainment, LLC, (hereinafter referred to as "Viva" or collectively with others "Defendants" and/or "Viacom Defendants") is a corporation organized and existing under the laws of the State of New Jersey, and conducts business in the

State of New York. The Viacom Defendants and Viva have a marketing and/or distribution agreement for films released in the United States.

20.     Upon information and belief, Viva marketed and/or distributed *SIK* within North America pursuant to a marketing agreement with the Viacom Defendants.

21.     Upon information and belief, the Viacom Defendants are components of a tightly-knit commercial organization of common owned entities, and the United States entities perform all the business services of its foreign agents, affiliates, and subsidiaries that could be performed here by its own officials (i.e., the Viacom Defendants as agents/parents entered contracts with one another and with third parties which benefitted and were binding on each other and on the foreign principals/affiliates/subsidiaries). The agents/parents acted for the benefit of, and with the knowledge and consent of, its foreign principals, subsidiaries, and affiliates. The actions taken by the agents and/or parents in this matter involve the development, production, manufacturing, distribution, and marketing of the infringing work.

22.     Upon information and belief, all of the Viacom Defendants, and the Viacom Defendants' affiliates/subsidiaries are, and at all times material hereto were, the alter-egos of each other and there exists, and has existed at all times material hereto, a unity of interest in ownership among such Defendants such than any separateness has ceased to exist in that these Defendants, and/or each of them, used assets of the other Defendants, and/or each of them, for its and/or their separate, individual purposes, and caused valuable assets, property rights and/or interests to be transferred to each other without adequate consideration.

23.     Upon information and belief, all of the Viacom Defendants, and the Viacom Defendants' affiliates/ subsidiaries, and other foreign subsidiaries, affiliates, and agents unknown at this time, at all times material hereto, were principals and agents, and/or mere departments of

one another, and a unity of interest and ownership among the Viacom Defendants, and their subsidiaries and affiliates, and the Viacom Defendants' affiliates, exists such that any separateness has ceased to exist; and the Viacom Defendants, and/or each of them, used assets of the other Defendants, and/or each of them, for its and/or their separate, individual purposes, and they transferred valuable assets, property rights and/or interests to each other without adequate consideration.

24.    Upon information and belief, all of the Viacom Defendants, and the Viacom Defendants' affiliates/ subsidiaries, and other foreign subsidiaries, affiliates, and agents unknown at this time, at all times material hereto are joint and severally liable, were principals and agents of one another, and at all times material hereto, were conducting business in the State of New York and this district for the purposes of N.Y. C.P.L.R. § 301, and/or have transacted business within the State of New York and/or contracted to supply goods or services in the State of New York in connection with the matters giving rise to this suit. Id. § 302(a)(1). These Defendants have also committed infringing acts outside of the State of New York causing injury to Plaintiff in the State of New York, and Defendants regularly do or solicit business in the State of New York, and/or derive substantial revenue from goods used or services rendered in the State of New York, and/or expect or reasonably should expect their infringing conduct to have consequences in the State of New York and derive substantial revenue from interstate commerce. Id. § 302(a)(2) and N.Y. U.D.C. § 404.

25.    Upon information and belief, the Viacom Defendants are mere departments, and/or both principal and agent of Viacom, as there is common ownership and/or control, there is financial dependency on Viacom, and Viacom's control is pervasive, including control over marketing and operational policies, and any purported corporate separation is merely formal and

technical.  The Viacom Defendants are financially dependent on Viacom, and Viacom interferes with the selection and assignment of personnel and exercises control over the Viacom Defendants' marketing and operational policies.  Thus, Viacom, bears joint and several liability for the obligations of the affiliate/ subsidiary and/or principal to lenders, and for domestic and foreign taxes on the earnings of domestic and foreign affiliates/ subsidiaries, and the financial position and results of the domestic and foreign operations are consolidated with the agent/parent.

## II.  The Defendants' Indian Agents And Affiliates

26.    Upon information and belief, the Viacom Defendants exploited *SIK* with the participation of Indian Agents and Affiliates as described herein.

27.    Upon information and belief, IFC, a company incorporated in India, jointly owns Viacom 18 and Studio 18 with Viacom, for which Viacom is the ultimate parent company.  IFC distributes *SIK* in India, and is controlled by Viacom, which is registered to do business in, and conducts business in, this district in the State of New York.

28.    Upon information and belief, IFC was formed for the purpose of distributing films (including *SIK*) produced and manufactured in the United States and in foreign territories pursuant to a distribution agreement with the Viacom Defendants.

29.    Upon information and belief, IFC conducts business in this district in the State of New York directly and through IFC's corporate parents, subsidiaries, owners, principals, and agents, including Viacom, Viacom 18, Studio 18, Saavn, Adlabs U.S.A., MTV India and Viva. There is financial dependency by IFC on the Viacom Defendants, and the Viacom Defendants' control of IFC is pervasive, including control over marketing and operational policies, and any purported corporate separation is merely formal and technical.

30.    Upon information and belief, IFC conducts business in this district in the State of New York directly and through IFC's corporate parents, subsidiaries, owners, principals, and agents, including Viacom and the Viacom Defendants who bear joint and several liability for the obligations of the affiliate/ subsidiary and/or principal to lenders, and for foreign taxes on the earnings of foreign affiliates/ subsidiaries, and for the financial position and results of the foreign operations are consolidated with the agent/parent.

31.    Upon information and belief, Defendant Viacom 18 Media Pvt., Ltd., (hereinafter "Viacom 18") is an Indian corporation owned and controlled by, and/or has equity interest owned by Viacom Inc., and conducts business in this district in the State of New York.

32.    Upon information and belief, Viacom 18 is a joint venture between Viacom, Inc. (a U.S. corporation and owner of Paramount Pictures Corp.) and Network 18 Group (India), and is a U.S. distributor of *SIK*.

33.    Upon information and belief, Studio 18 (India) is an Indian joint venture owned by Viacom and Network 18 Group (India) and is a theatrical distributor of *SIK* in India. Further, upon information and belief, Studio 18 (India) is a distribution arm of the Viacom Defendants, and receives a share of the sales and/or profits from the domestic and international distribution of DVDs of *SIK*.

34.    Upon information and belief, Reliance Anil Dhiribhai Ambani Group (India) (a/k/a Reliance ADA Group and/or Reliance Big Entertainment, hereinafter "Reliance") is a diversified conglomerate in the financial services and entertainment industries.

35.    Upon information and belief, Network 18 Group (India) (hereinafter "Network 18") is a publicly-traded film and television conglomerate and co-owns MTV India with Viacom.

36.    Upon information and belief, Reliance MediaWorks, Ltd. f/k/a Adlabs Films, Ltd.

(India) (hereinafter "Adlabs India") is a foreign theatrical distributor and is owned by Reliance. It is a leading Indian conglomerate engaged in film production, processing, post production and distribution, as well as owning a subsidiary, BIG Cinemas, C.A. (India) (hereinafter "BIG") which operates the leading theatres in India known as "BIG Cinemas."

37.     Upon information and belief, Big Home Video (India) (hereinafter "BHV") is owned by Reliance, released the home video of *SIK*, and also has marketing and distributing rights for Universal Pictures International, B.V., Paramount Pictures, Inc. and DreamWorks, LLC. These DVDs are sold through BIG's own theaters, as well as through digital distributors (via the internet) in India.

38.     Upon information and belief, M/S Block Buster Movie Entertainers (India) (hereinafter "Block Buster") produced *SIK*, is owned by Reliance and *SIK* producer Vipul Shah, is located in Mumbai, India and Block Buster is an affiliate of Blockbuster (U.S.).

39.     Upon information and belief, the Indian Agents and Affiliates are alter-egos, mere departments, or both principals and agents of the Viacom Defendants, specifically Viacom, as there is common ownership, there is financial dependency on Viacom, and Viacom's control is pervasive, including control over marketing and operational policies, and any purported corporate separation is merely formal and technical. The Indian Agents and Affiliates are financially dependent on the Viacom Defendants, which interfere with the selection and assignment of personnel, and exercises control over the Indian Agents' and Affiliates' marketing and operational policies. The Viacom Defendants bear joint and several liability for the obligations of the Indian Agents and Affiliates to lenders, and for domestic and foreign taxes on the earnings of domestic and foreign affiliates/ subsidiaries, and the financial position and results of foreign operations are consolidated with the agent/parent.

40.     Upon information and belief, the fictitiously named Defendants captioned hereinabove as Does 1 through 10, inclusive, and each of them, were in some manner responsible or legally liable for the actions, damages, events, transactions and circumstances alleged herein. The true names and capacities of such fictitiously named defendants, whether individual, corporate, associate, or otherwise are presently unknown to the Plaintiff and Plaintiff will amend this Complaint to assert the true names and capacities of such fictitiously named Defendants when the same have been ascertained. For convenience, each reference herein to a named Defendant or to Defendants shall also refer to the Doe Defendants and each of them.

41.     Upon information and belief, each and all of the Defendants jointly and severally with the India Agents and Affiliates contributed to, and/or participated in, the infringing activity as set forth below and each Defendant was acting within the course and scope of employment, partnership and/or agency with the other, and each of the Defendants is jointly and severally liable for the injuries to Plaintiff.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### I.  Plaintiff's Work: The Madame La Gimp Story

42.     In 1929, author Damon Runyon (hereinafter "Runyon" or "Author") wrote an original short story which was published in the October 1929 Hearst's International-Cosmopolitan Magazine entitled *Madame La Gimp* (the "*MLG* story") which is generally recognizable by the public through the Derivative Films *Lady for a Day* and *Pocketful of Miracles*, both produced and directed by Frank Capra, and *Miracles*. Runyon was one of America's most popular newspaper columnists and short story writers from the Jazz Age through World War II, and is best known as a prolific humorist. Numerous short stories by Damon Runyon were made into motion pictures, including, among others, adaptations of *Madame La*

*Gimp* and *Little Miss Marker* which launched the career of Shirley Temple.  Runyon is also well known for *The Idyll of Miss Sarah Brown* which is the basis for the theatrical stage musical and subsequent feature film *Guys and Dolls*.

43.     The copyright in the *Madame La Gimp* story was originally registered for copyright in the name of International Magazine Co., Inc as a publication date of September 10, 1929, under entry No. B: 41297, which on June 5, 1931 was assigned to Runyon and recorded on October 11, 1932 in book 292, page 239.

44.     Runyon died in New York City in 1946.  The proper statutory heirs of Runyon filed an application for Registration of a Claim to the Renewal of Copyright (R-176670 on September 10, 1956)(attached hereto as Exhibit "C").

45.     Plaintiff is the proprietor of the renewal copyright in the *MLG* story by transfer dated June 30, 2000, recorded July 7, 2000, in Vol. 3455, Do. 24, Page 1-2 from Sheldon Abend d/b/a Author's Research Company to American Entertainment Rights Company, LLC to which Plaintiff is the successor in interest (attached hereto as Exhibit "D").

46.     The *MLG* story contains original and significant plot, sequence, pattern, characters, scenes, themes, concepts, expressions, separately and in combination, which in absolute terms, and particularly in the film industry, are specific, original, unique, novel, and were never commercially available or exploited in the film industry, except upon written permission from the Plaintiff.

47.     The *MLG* story contains elements that are combined and arranged in an original and copyright protectable manner.

48.     The *MLG* story has been adapted into several notable motion pictures which include elements of the underlying *MLG* story (the "Derivative Films").  Elements of the *MLG*

story that are embodied in the Derivative Films are the protectable property of the Plaintiff.

49.     The *MLG* story and, upon information and belief, the Derivative Films were registered in conformity with the provisions of the United States Copyright Act and all other applicable laws in the United States governing copyright.

## II. The Derivative Films

50.     On or about September 29, 1932, renowned film director, Frank Capra (hereinafter "Capra") obtained motion picture rights to the *MLG* story.

51.     The motion picture resulting from the MLG story as "*Lady for a Day*" was directed by Capra from a screenplay written by screenwriter Robert Riskin. Capra and Riskin received Academy Award nominations for the *Lady for a Day* film.

52.     The MLG story, its structural spine, organization, format, back story, primary characters, plot, setting, theme, scenes, pattern, sequence, and total concept and feel are embodied in the *Lady for a Day* film.

53.     In 1961, the *Lady for a Day* film was remade into the motion picture *A Pocketful of Miracles* (hereinafter "*POM*"), also directed by Capra.

54.     In or about 1989, producer and director, Jackie Chan, produced a film derivative from the *MLG* story, *Lady for a Day*, and *POM* namely Miracles (among other titles also known as *JiJi*, *Mr. Canton and Lady Rose*, *The Canton Godfather*, and *The Black Dragon* hereafter collectively "*Miracles*").  *Miracles* was released by Sony Pictures and others in the United States in or about 2001.

55.     In or about March 13, 2003, Plaintiff's predecessor entered a settlement agreement with *Miracles'* producers (hereinafter "Settlement Agreement"), which, among other things, provides that royalties will be paid to Plaintiff for past and future use of elements of the

*MLG* story in *Miracles.*

56.     The Settlement Agreement further acknowledges Plaintiff's copyright ownership interest in the *MLG* story, and Plaintiff therein merely granted to the owner of the *Miracles* film the non-exclusive right to exploit those elements of the *MLG* story which are embodied in the *Miracles* film, whether or not such element are copyright protectable.

57.     The Settlement Agreement provides, inter alia, material inducements to Plaintiff and is subject to conditions as follows:

(a)     Plaintiff owns the exclusive right to re-make, adapt, or copy the *MLG* story;

(b)     Plaintiff reserves all rights not specifically granted in the Settlement Agreement;

(c)     Plaintiff owns theatrical rights to the *MLG* story subject to the continued distribution and exploitation of the *Miracles* film including elements of the *MLG* story, but only to the extent that the *MLG* story is specifically depicted and embodied in the *Miracles* film;

(d)     The owners of the *Miracles* film are prohibited from modifying, or from producing a sequel to, or from making other works derivative of the *MLG* story and of the *Miracles* film;

(e)     The Settlement Agreement provides conditions to, and restrictions and reservations upon, the use of ideas, elements, and expressions embodied in the *Miracles* film which are exclusive to Plaintiff, and the ideas and other elements contained in the *MLG* story and as embodied in the *Miracles* film are contractually protected on behalf and for the benefit of Plaintiff, whether or not the ideas and elements are copyright protectable;

(f)     The Settlement Agreement is binding upon all persons or entities

authorized to exploit, or assist in exploiting, the *Miracles* film and requires that the *Miracles* film accord credit to Damon Runyon as the writer of the *MLG* story.

58.     Each public display of the *Miracles* film and every DVD manufactured of the *Miracles* film displays, or should accord and reflect, a copyright notice informing the viewer and the general public that the motion picture is protected by copyright laws, and additionally, pursuant to the Settlement Agreement, accord a credit to Damon Runyon.

59.     Plaintiff continues to grant licenses for various rights in and to the *MLG* story, and the Settlement Agreement granting certain limited rights to the owners of the *Miracles* film by Plaintiff is still valid and binding.

60.     Plaintiff has, along with the owner of the *Miracles* film, mutually benefited from exploitations of the *Miracles* film by jointly licensing clips from the *Miracles* film, and by sharing royalties from the licensing of the *Miracles* film.

61.     Plaintiff has developed, and Plaintiff has come to expect and rely upon, a course of dealing whereby Plaintiff enjoys opportunities, inquiries, and mutual benefit from the licensure of clips and stills from the Derivative Films.

62.     Collectors editions of the Derivative Films which accord credit to Damon Runyon continue to be manufactured, duplicated, distributed and used with new subtitles, interviews, and re-release trailers to a contemporary worldwide audience.

### III.  The Infringing *Singh is Kinng* Film

63.     Upon information and belief, Defendants developed and produced a film known as "*Singh is Kinng*" which, in fact, is based upon the same expression, pattern, sequence and combination of concepts, ideas and expressions contained in the *MLG* story and as such is embodied in the Derivative Films (Exhibit "E", *SIK* English Language subtitles).

64.    Upon information and belief, the creation of *SIK* came from the desire by Bimal Oberoi ("Oberoi"), producer Vipul Amrutlal Shaw ("Shaw"), and director Anees Bazmee ("Bazmee"), to adapt and/or re-make the *MLG* story and the Derivative Films, specifically the *Miracles* film, for a younger audience.

65.    The spontaneous reaction of ordinary observers and film reviewers was that *SIK* copied, and was adapted from, the Derivative Films which embody the *MLG* story:

(a)    Wikipedia: "the plot is loosely adapted from the Jackie Chan hit *Miracles*";

(b)    Amazon.com: "the plot [of *SIK*] takes time to borrow from a page from Frank Capra's *Lady for a Day*"; and

(c)    Variety: "obviously inspired by Frank Capra's *A Pocketful of Miracles.*"

66.    The *MLG* story and the Derivative Films are widely disseminated, have been the subject of academic critiques and analyses, and have received great recognition in the literary and film industries.  The title (the name) *Madame La Gimp* has achieved a significance and identification with the public and in the entertainment industry attaining a secondary meaning.

67.    Upon information and belief, all Defendants had access to the *MLG* story and the Derivative Films, and there is a reasonable possibility that all Defendants had an opportunity to view and/or copy the *MLG* story and the Derivative Films.

68.    Upon information and belief, *SIK* copied the *MLG* story directly and copied the *MLG* story indirectly via the Derivative Films.

69.    Upon information and belief, in or about 2008, the producers of *SIK* entered agreements with Viacom, IFC affiliates, and others in connection with the financing, domestic and foreign theatrical and DVD distribution, and further exploitation and marketing of *SIK*.

70.     Upon information and belief, with respect to the use, international theatrical distribution and exploitation rights in and to *SIK* in territories other than the United States, the Viacom Defendants, after committing acts (i.e. copying, reproducing, and manufacturing) in the United States for the purposes of international distribution, entered into, and derived revenue and profits from, license agreements, and/or distribution servicing agreements, and/or other third party agreements with the Viacom Defendants' affiliates, other controlled affiliates, licensee affiliates, sub-distributors, and other entities.

71.     Upon information and belief, all Defendants knew, or should have known had they conducted reasonable, adequate or good faith investigation that the rights to adapt, reproduce, perform, display, produce and distribute and exploit a film based upon and derived from the *MLG* story, or the Derivative Films, were clearly owned and controlled by parties other than Defendants, including the Plaintiff, and that Defendants' activities and course of conduct required consent and a grant of rights by the Plaintiff.

72.     Upon information and belief, the Viacom Defendants by various means, expressly or tacitly, participated in, contributed to, and/or tolerated and permitted all the Defendants, their Indian agents and affiliates, and other third parties, to infringe upon the *MLG* story and to distribute *SIK* overseas.

73.     Upon information and belief, in or about 2008 the Viacom Defendants commenced preliminary development of *SIK* in India and in the United States, with principal photography in Australia.

74.     Upon information and belief, all Defendants, with knowledge and intent, participated in, contributed to, financed, developed, produced, manufactured, distributed, and exploited *SIK* which is derivative of the *MLG* story and Derivative Films without properly

securing consent, approval, grant, or license from the Plaintiff.

75.     Upon information and belief, none of the named Defendants made any effort to remove from the *SIK* screenplay or *SIK* copyrighted elements and material embodied in the Derivative Films derived from the *MLG* story, and as embodied in the Derivative Films, and these acts, failures, and omissions constitute a reckless disregard of Plaintiff's rights and interests.

76.     Upon information and belief, in or about August 8, 2008, the Viacom Defendants, along with their Indian agents and affiliates began foreign theatrical distribution of *SIK*.

77.     Upon information and belief, in or about August 2008, the Viacom Defendants, and Studio 18 specifically, began distribution in the United States, and Adlabs (India) began foreign DVD distribution, with the film credits in all advertising stating "Story by Anees Bazmee and Suresh Nair."

78.     Upon information and belief, all Defendants, and their executives and representatives, had knowledge of Plaintiff's rights under the Settlement Agreement, and in or about 2008 representatives of the Viacom Defendants, held meetings in the United States to authorize financing, producing, and distributing *SIK* films, at which time all Defendants were further informed about *SIK* and the Settlement Agreement.

79.     Upon information and belief, each and all of the Defendants directly infringed the *MLG* story and the Derivative Films, and they knew, or should have known, of the infringing acts of each of the other Defendants and their Indian agents and affiliates, and they materially participated in, and contributed to the infringement.

80.     All Defendants are liable for contributory infringement in that they knowingly caused, induced and/or materially contributed to the infringing acts of parties with whom they

had a direct connection, and/or distribution servicing agreements, and/or third party service agreements including, but not limited to, Viacom and the Viacom Defendants' Indian agents and affiliates.

81. All Defendants are vicariously liable for copyright infringement as they had the right and the power to control both directly and pursuant to distribution servicing agreements and/or third party service agreements, including those related to foreign territories, the activities of each and all Defendants, as well as the infringing activities of the Viacom Defendants' Indian agents and affiliates, and others, and these Defendants received a direct financial benefit, financial advantages, and/or other economic consideration from the infringing activities. Thus, all Defendants are liable for foreign profits resulting from the copyright infringement in the United States.

82. All Defendants, are principals and agents for their subsidiaries, producers, and affiliates, as much of the product exported to, and marketed by the Viacom Defendants' affiliates and subsidiaries is derived from all Defendants' activities in the United States, specifically, development, production, reproduction, printing, manufacturing, and marketing.

83. Upon information and belief, agreements were entered into between the agent and/or parent Defendants and their foreign subsidiaries, affiliates, and distributors which, along with their course of dealing, created agency relationships.

84. Upon information and belief, Viacom, as agents, principals and parents of foreign affiliates, including the Viacom Defendants' affiliates, entered contracts which were binding on their foreign affiliates, including contracts for distribution and are liable for the foreign profits of these foreign affiliates for their copyright infringement.

85. The Viacom Defendants' foreign affiliates, induced, participated in, and

contributed to, acts of copyright infringement in the United States, namely the adaptation and reproduction of copyrighted material in the United States preliminary to its publication and/or distribution abroad.

86.     Upon information and belief, all Defendants failed to curtail, stop, or enjoin Defendants and others from infringing upon Plaintiff's rights and interests in the *MLG* story and as embodied in the Derivative Films or take any legal action, but instead, concealed information in their possession and induced Plaintiff's inaction to protect its rights.

87.     Upon information and belief, the acts of copyright infringement complained of herein occurred in whole or in part within the United States which resulted in profits in the foreign countries, including, but not limited to: India, Germany, Italy, Mexico, New Zealand, Norway, Spain, Sweden, UK, Netherlands, Japan, Serbia, Montenegro, Bosnia, Hezegovina, France, Australia, Argentina, Singapore, Switzerland, Belgium, Algeria, Monaco, Morroco, Tunisia, South Korea, and Mexico.

88.     All Defendants, by their actions, failures, and omissions, constitute competitors with Plaintiff for the exploitation of remakes, sequels, or adaptations of the *MLG* story and/or the Derivative Films.

89.     *SIK* continues and incorporates essentially the same story as the *MLG* story as both emerge from a situation conceived and created by Runyon which constitutes the "spring board" for *SIK*.

90.     An analysis of *SIK* reveals expressions of ideas, the compilation of ideas, a concrete pattern or sequence of events, and scenes that are substantially similar to those contained in the *MLG* story and as embodied in the Derivative Films.  Some of the similarities between the *MLG* story, the Derivative Films, and *SIK* include:

a)  Although filmed in Australia, *SIK* takes place in *Madame La Gimp's* urban setting with American style criminal elements, such as American cars, men dressed in the style of American gangsters and guns.

b)  In both the *MLG* story and *SIK*, a poor, elderly female flower peddler – called "Rose Lady" or "Ma'am Rose" in *SIK* – sells flowers to passersby on the city streets; (in *Miracles* she is called "Rose").

c)  In both, Madame La Gimp/Rose Lady has a daughter that is living elsewhere and with whom she has kept in touch by mail.

d)  In both, Madame La Gimp/Rose Lady has pretended in her letters to her daughter to be a wealthy woman.

e)  In both the *MLG* story and *SIK*, the daughter has become engaged to the son of a wealthy man and Madame La Gimp/Rose Lady has learned that her daughter, the fiancé and the fiancé's father are traveling by boat to meet Madame La Gimp/Rose Lady before the fiancé's father gives his approval of the marriage.

f)  In both, the young couples are very much in love and if the fiancés' fathers find out Madame La Gimp/Rose Lady are just flower peddlers, the young couples may be unable to marry, and their hearts will be broken.

g)  In both the *MLG* story and *SIK*, the boss of a gang – Dave the Dude in the *MLG* story and Happy Singh in *SIK* – is kind-hearted and always gives Madame La Gimp/Rose Lady money and buys her flowers when he sees her.

h)  In both, after learning of Madame La Gimp/Rose Lady's predicament, Dave the Dude/Happy Singh decides, despite the reservations of his associate, to help her convince the fiancé's father that she is the wealthy, woman she has pretended to be.

i) In both, Dave the Dude/Happy Singh arranges for Madame La Gimp/Rose Lady to stay in fine lodgings - a suite at a swank hotel in the *MLG* story and a mansion in *SIK*.

j) In both, Dave the Dude's/Happy Singh's female cohort gets Madame La Gimp/Rose Lady new clothes and a beauty makeover.

k) In both, Madame La Gimp / Rose Lady is concerned about the others finding out the truth.

l) In both, Dave the Dude/Happy Singh's female cohort does a fantastic job making over Madame La Gimp/Rose Lady, who in her new clothes and makeup looks beautiful.

m) In both, Madame La Gimp/Rose Lady and Dave the Dude/ Happy Singh – go to the port to meet the boat bringing Madame La Gimp/Rose Lady's daughter, fiancé and prospective father-in-law.

n) At the port, Madame La Gimp/Rose Lady and her daughter meet in a tearful reunion.  Madame La Gimp/Rose Lady's daughter is beautiful and she and her fiancé, who is a very nice-looking quiet guy, make a beautiful young couple and are very much in love.

o) In both the *MLG* story and *SIK*, Dave the Dude/Happy Singh also arranges for Madame La Gimp/Rose Lady to have a party for the daughter, fiancé and fiancé's father, at "their" suite in the swank hotel (the *MLG* story) or mansion (*SIK*).

p) In both, Madame La Gimp/Rose Lady is dressed in a fine evening dress and jewelry.

q) In both, Dave the Dude / Happy Singh arranges for his coarse gangster friends, together with "dolls" from the nightclub, to attend the reception pretending to be well-to-do and famous people.

r) In both, despite the concerns of Dave the Dude/Happy Singh's associates, the

charade is not exposed and Madame La Gimp/Rose Lady's daughter, the fiancé and the prospective father-in-law are all fooled and greatly impressed.

91.    In sum, *SIK* contains another, albeit unauthorized, movie version of the *MLG* story and incorporates the essence, structure, pattern, and sequence of the *MLG* story.  The similarities may also be descended according to similarities in plot, mood, characterization, pace, sequence of events/pattern and others such as dialogue:

**PLOT/ SEQUENCE/ PATTERN**

92.    The essence, structure, pattern, and sequence of the *MLG* story and *Miracles* is copied in *SIK*.

| *Madame La Gimp* | *Miracles*  (1989) (a/k/a "Mr. Canton and Lady Rose") | *Singh is Kinng*  (2008) |
|---|---|---|
| 1.  Destitute lady uses bohemian and criminal characters to pull elaborate ruse to convince daughter and fiancé that she is a well-to-do lady. | Destitute lady uses bohemian and criminal characters to pull elaborate ruse to convince daughter and fiancé that she is a well-to-do lady. | Destitute lady uses bohemian and criminal characters to pull elaborate ruse to convince daughter and fiancé that she is a well-to-do lady. |
| 2.  Madame La Gimp is estranged from daughter and has for years written her on stationery pretending to be wealthy. | Lady Rose is estranged from daughter and has for years written her on stationery pretending to be wealthy. | Rose Lady is estranged from daughter and has for years written her on stationery pretending to be wealthy. |
| 3.  Madame La Gimp learns that her daughter who is now grown up and engaged to be married, is coming with her fiancé and his father so that the father can meet Madame La Gimp and give his approval for his son's marriage to her daughter. | Lady Rose learns that her daughter who is now grown up and engaged to be married, is coming with her fiancé and his father so that the father can meet Lady Rose and give his approval for his son's marriage to her daughter. | Rose Lady learns that her daughter who is now grown up and engaged to be married, is coming with her fiancé and his father so that the father can meet Rose Lady and give his approval for his son's marriage to her daughter. |
| 4.  Dave the Dude agrees to | Charlie Cheng agrees to help | Happy Singh agrees to help |

| | | |
|---|---|---|
| help Madame La Gimp pretend to be wealthy, and enlists the help of his associate & his girlfriend. | Lady Rose pretend to be wealthy, and enlists the help of his associate & his girlfriend. | Rose Lady pretend to be wealthy, and enlists the help of his associate & his girlfriend. |
| 5.  An elderly con man, the Judge, agrees to pretend to be the wealthy husband of Madame La Gimp. | An elderly con man, the Judge, agrees to pretend to be the wealthy husband of Lady Rose. | An elderly con man, the Uncle, agrees to pretend to be the wealthy friend of Rose Lady. |
| 6.  Dave the Dude arranges for Madame La Gimp to stay in a swank residence while her daughter, the fiancé and father are in town. | Charlie Cheng arranges for Lady Rose to stay in a swank residence while her daughter, the fiancé and father are in town. | Happy Singh arranges for Rose Lady to stay in a mansion while her daughter, the fiancé and father are in town. |
| 7.  Madame La Gimp is given new clothes and a beauty makeover, transforming the flower peddler into a beautiful, aristocratic woman. | Lady Rose is given new clothes and a beauty makeover, transforming the flower peddler into a beautiful, aristocratic woman. | Rose Lady is given new clothes and a beauty makeover, transforming the flower peddler into a beautiful, aristocratic woman. |
| 8.  The Judge is pleasantly surprised to see the "new" Madame La Gimp. | The Judge is pleasantly surprised to see the "new" Lady Rose. | The Uncle is pleasantly surprised to see the "new" Rose Lady. |
| 9.  Madame La Gimp and her "husband," the Judge, go to the port to meet the boat bringing her daughter, the fiancé and the fiancé's father, where she and her daughter have a tearful reunion. | Lady Rose and her "husband," the Judge, go to the port to meet the boat bringing her daughter, the fiancé and the fiancé's father, where she and her daughter have a tearful reunion. | Rose Lady and the Uncle, go to the port to meet the boat bringing her daughter, the fiancé and the fiancé's father, where she and her daughter have a tearful  reunion. |
| 10. They go to the hotel where Madame La Gimp is pretending to live. | They go to the hotel where Lady Rose is pretending to live. | They go to the mansion where Rose Lady is pretending to live. |
| 11. Dave the Dude arranges for a party, with VIP guests, for the daughter, fiancé and father, in the suite at the hotel where Madame La Gimp and her | Charlie Cheng arranges for a party, with VIP guests, for the daughter, fiancé and father, in the suite at the hotel where Lady Rose and her "husband" are pretending to live. | Happy Singh arranges for a party, with VIP guests, for the daughter, fiancé and father, at the mansion where Rose Lady is pretending to live. |

| | | |
|---|---|---|
| "husband" are pretending to live. | | |
| 12. A fancy party with a band is held for the daughter, her fiancé and the fiancé's father, and a man pretending to be a butler loudly announces the name of each prominent guest. | A fancy party with a band is held for the daughter, her fiancé and the fiancé's father, and a man pretending to be a butler loudly announces the name of each prominent guest. | A fancy party with a band is held for the daughter, her fiancé and the fiancé's father, and a man pretending to be a butler loudly announces the name of each prominent guest. |
| 13. Madame La Gimp's daughter, her fiancé and the fiancé's father are fooled, and the daughter and fiancé marry. | Lady Rose's daughter, her fiancé and the fiancé's father are fooled, and the daughter and fiancé marry. | Rose Lady's daughter, her fiancé and the fiancé's father are fooled, and the daughter and Happy Singh marry. |

**MOOD**

| *Madame La Gimp* | *Miracles* (1989) (a/k/a "Mr. Canton and Lady Rose") | *Singh is Kinng* (2008) |
|---|---|---|
| 14. Comedic; Ironic: Kind-hearted criminal elements have a soft spot for an elderly flower peddler and a young couple in love. | Comedic: Kind-hearted criminal elements have a soft spot for an elderly flower peddler and a young couple in love. | Comedic: Kind-hearted criminal elements have a soft spot for an elderly flower peddler and a young couple in love. |

**CHARACTERIZATION**

| *Madame La Gimp* | *Miracles* (1989) (a/k/a "Mr. Canton and Lady Rose") | *Singh is Kinng* (2008) |
|---|---|---|
| 15. Madame La Gimp, the poor, elderly female flower peddler who lives apart from her young, beautiful daughter and who for years has pretended to be a wealthy woman. | Lady Rose, the poor, elderly female flower peddler who lives apart from her young, beautiful daughter and who for years has pretended to be a wealthy woman. | Rose Lady, the poor, elderly female flower peddler who lives apart from her young, beautiful daughter and who for years has pretended to be a wealthy woman. |
| 16. Dave the Dude, the kind-hearted gangster who | Charlie Cheng, the kind-hearted gangster who always | Happy Singh, the kind-hearted gangster who always buys the |

| | | |
|---|---|---|
| always buys the flowers Madame La Gimp sells and who helps her pretend to be wealthy in order to fool the father of her daughter's fiancé, so that her daughter and her daughter's fiancé can get married. | buys the flowers Lady Rose sells and who helps her pretend to be wealthy in order to fool the father of her daughter's fiancé, so that her daughter and her daughter's fiancé can get married. | flowers Rose Lady sells and who helps her pretend to be wealthy in order to fool the father of her daughter's fiancé, so that her daughter and her daughter's fiancé can get married. |
| 17. Dave the Dude's cynical associates, who are against the idea of the charade but reluctantly help. | Charlie Cheng's cynical associates, who are against the idea of the charade but reluctantly help. | Happy Singh's cynical associates, who are against the idea of the charade but reluctantly help. |
| 18. Dave the Dude's girlfriend, a former nightclub singer in Madame La Gimp, who helps with the charade and obtains new clothes and a beauty makeover for Madame la Gimp. | Charlie Cheng's girlfriend, a former nightclub singer in Madame La Gimp, who helps with the charade and obtains new clothes and a beauty makeover for Lady Rose. | Happy Singh's female friend, an actress in SIK, who helps with the charade and obtains new clothes and a beauty makeover for Rose Lady. |
| 19. The Judge, the con man, who is enlisted to play Madame La Gimp's "husband" is pleasantly surprised to see her transformation. | The Judge, the con man, who is enlisted to play Lady Rose's "husband" is pleasantly surprised to see her transformation. | Uncle, the con man, is pleasantly surprised to see her transformation. |
| 20. Madame La Gimp's beautiful daughter, who has lived apart from her mother and returns after becoming engaged so that her fiancé's father can approve the marriage. | Lady Rose's beautiful daughter, who has lived apart from her mother and returns after becoming engaged so that her fiancé's father can approve the marriage. | Rose Lady's beautiful daughter, who has lived apart from her mother and returns after becoming engaged so that her fiancé's father can approve the marriage. |
| 21. The daughter's fiancé, a very nice-looking quiet young man. | The daughter's fiancé, a very nice-looking quiet young man. | The daughter's fiancé, a very nice-looking quiet young man. |
| 22. The fiancé's father, a wealthy man who wishes to meet Madame La Gimp | The fiancé's father, a wealthy man who wishes to meet Lady Rose before approving his | The fiancés father, a wealthy man who wishes to meet Rose Lady before approving his |

| | | |
|---|---|---|
| before approving his son's marriage to her daughter. | son's marriage to her daughter. | son's marriage to her daughter. |
| 23. The coarse gangsters are enlisted to portray well-to-do guests at the party. | The coarse gangsters who enlisted to portray well-to-do guests at the party. | The coarse gangsters who enlisted to portray well-to-do guests at the party. |
| 24. The "dolls" from the nightclub who also appear as guests at the party; and the man pretending to be the butler and who announces each guest as they arrive at the party. | The "dolls" from the nightclub who also appear as guests at the party; and the man pretending to be the butler and who announces each guest as they arrive at the party. | The "dolls" from the nightclub who also appear as guests at the party; and the man pretending to be the butler and who announces each guest as they arrive at the party. In *SIK*: "Aunt, you have thrown such a big party to welcome us.- Thank you!" Embedded Subtitles, No. 1300 |

## PACE

| *Madame La Gimp* | *Miracles* (1989) (a/k/a "Mr. Canton and Lady Rose") | *Singh is Kinng* (2008) |
|---|---|---|
| 25. Fast/ Action/ Several Days Neither is plodding or frenetic. | Fast/ Action/ Several Days Neither is plodding or frenetic. | Fast/ Action/ Several Days Neither is plodding or frenetic. |

## SETTING

| *Madame La Gimp* | *Miracles* (1989) (a/k/a "Mr. Canton and Lady Rose") | *Singh is Kinng* (2008) |
|---|---|---|
| 26. Urban gang-land; American style gangsters, cars, clothes, & weapons. | Urban gang-land; American style gangsters, cars, clothes, & weapons. | Urban gang-land; American style gangsters, cars, clothes, & weapons. |
| 27. Swank hotel | Swank hotel/ estate | Mansion |
| 28. Port Scenes | Port Scenes | Port Scenes |
| 29. Nightclub scenes | Nightclub scenes | Nightclub scenes |

## OTHER SIMILARITIES:

| *Madame La Gimp* | *Miracles* (1989) | *Singh is Kinng* (2008) |
|---|---|---|

|  | (a/k/a "Mr. Canton and Lady Rose") |  |
|---|---|---|
| 30. In Madame La Gimp her daughter is returning after years. | In *Miracles*, the daughter is returning after a long absence. | In *SIK*: "My daughter's coming back tomorrow after three years." Embedded Subtitles, No. 1150 |
| 31. In *Madame La Gimp*, those in on the charade do not want to disappoint her daughter and her fiancé. | In *Miracles*, the Judge/Uncle says "we mustn't disappoint the love birds." | In *SIK*: "But I always hid this fact from my daughter." Embedded Subtitles, No. 1159 "Ill be exposed when she discovers… that her mom sells flowers by the roadside?" Embedded Subtitles, Nos. 1167, 1168 |
| 32. In *Madame La Gimp*, Madame La Gimp explains to Dave the Dude that the fiancé's father is coming to check her out before approving his son's marriage to her daughter. | In *Miracles*, Lady Rose tells the fiancé's father that she knows he "came to Hong Kong to check on [the daughter's] background." | In *SIK*: "But now she's coming tomorrow with the man she loves." Embedded Subtitles, No. 1164 "I've heard he's from a very rich family." Embedded Subtitles, No. 1165 |
| 33. Criminal Elements have redeeming qualities, a basic decency, and a soft spot for motherhood and for love, and they provide generosity and joy to a destitute lady. | Criminal Elements have redeeming qualities, a basic decency, and a soft spot for motherhood and for love, and they provide generosity and joy to a destitute lady. | Criminal Elements have redeeming qualities, a basic decency, and a soft spot for motherhood and for love, and they provide generosity and joy to a destitute lady. In *SIK*: "Servants, you're about to do a great deed today." Embedded Subtitles, No. 1218 |

93.     The *MLG* story's significant character, the "Rose Lady", constitutes protectable expression as the character was developed by Runyon, the character constitutes the story being

told in the *MLG* story and the Derivative Films, the plot unfolds from the character's visual perspective, and because the *MLG* story and Derivative Films focus on the attributes and interplay of this character.

94.    *SIK* utilizes numerous attributes, aspects, and qualities of the "Rose Lady" character, and the interplay with other characters, which are substantially similar to those utilized in the *MLG* story and Derivative Films.

95.    Upon information and belief, in *SIK* the Defendants purposefully employed immaterial variations or transparent re-phrasing to produce essentially an update of the same story as the *MLG* story, and Defendants' additions, alterations, and editing choices provide evidence of copying rather than independent creation.

96.    The acts of infringement committed abroad were permitted and/or initiated by preliminary, predicate acts of infringement within the United States by all Defendants, namely the adaptation, reproduction, manufacturing, distribution, printing, editing, and marketing of *SIK* with the intention and purpose of exporting it to the Viacom Defendants' subsidiaries, affiliates, and distributors in foreign territories, including the Indian Agents and Affiliates.

97.    The Viacom Defendants have acted as agents and distributors in the United States for their foreign subsidiaries and affiliates, and for Defendants' Indian Agents and Affiliates.

## FIRST CLAIM FOR RELIEF

### (Copyright Infringement, 17 U.S.C. §§ 101 et seq. – Against All Defendants)

98.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 97 inclusive, as though fully set forth herein.

99.    Plaintiff owns the renewal copyright in the *MLG* story, and elements of the *MLG* story embodied in the Derivative Films, which are original copyrighted works under the laws of

the United States.

100.    Plaintiff has the exclusive right to prepare derivative works based upon the *MLG* story pursuant to 17 U.S.C. § 106 (2), as well as all other rights provided for in § 106.

101.    The Defendants' acts and those of their agents, subsidiaries and/or affiliates, in the United States and in foreign territories, including copying, downloading, use, modification, reproduction, display marketing, distribution and exploitation of the elements of the *MLG* story, and as embodied in the Derivative Films, including without limitation, the ideas, expression of concepts, pattern, sequence, theme, text and plot contained therein and all derivatives thereof, constitute a violation of the United States Copyright Act, Title 17 U.S.C. §§ 501(a), 106(1) - 106(6), and all Defendants were acting as infringers within the meaning of 17 U.S.C. § 105(a).

102.    By all the Defendants' participation in, and contributions to, the production, distribution, use, and exploitation of *SIK* both in the United States and for export to foreign territories, Defendants knowingly and willfully infringed, authorized others to infringe, and will continue to infringe Plaintiff's copyright in the *MLG* story as embodied in the Derivative Films.

103.    As a proximate result of Defendants' copyright infringement, and that of their agents, affiliates, subsidiaries, and distributors, both in the United States and in foreign territories, Plaintiff has suffered and will continue to suffer irreparable injury, some of which cannot be compensated in money damages if such wrongful conduct continues.

104.    All named Defendants are jointly and severally liable for infringement.

WHEREFORE, Plaintiff is entitled to and prays for relief as follows:

105.    A permanent injunction, pursuant to 17 U.S.C. § 502, enjoining all Defendants, their officers, agents, employees, licensees, assigns, distributors, sub-distributors, and all persons acting in concert with them, from engaging in such further violations of the Copyright Act;

106.   A permanent injunction enjoining all Defendants, their officers, agents, employees, licensees and assigns, distributors, sub-distributors, and all persons acting in concert with them, from engaging in or authorizing the production, copying, distribution and/or exploitation of *SIK*;

107.   Recovery from all Defendants of the damages, including pre-judgment interest it sustained and will sustain, and any income, gains, profits, and advantages obtained by Defendants and their subsidiaries, affiliates, distributors, and service providers, both domestic and foreign, as a result of their wrongful acts alleged hereinabove pursuant to 17 U.S.C. § 504(b), in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial;

108.   The maximum statutory damages in the amount of $30,000.00 per infringement, and/or $150,000.00 per willful infringement pursuant to 17 U.S.C. § 504(c), or for such other amount as may be proper under 17 U.S.C. § 504(c). Plaintiff is further entitled to their attorney's fees and full costs pursuant to 17 U.S.C. § 505; and

109.   For such other and further relief and remedies available under the Copyright Act, 17 U.S.C. §§ 101 et seq., and/or for which the Court may deem just and proper, including punitive damages.

## SECOND CLAIM FOR RELIEF

### (Contributory Copyright Infringement under 17 U.S.C. §§ 101 et seq.<br>Against All Defendants)

110.   Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 97 inclusive, as though fully set forth herein.

111.   Upon information and belief, all Defendants individually, and in concert with the other named Defendants, the Indian Agents and Affiliates, and with other persons and entities,

encouraged, induced, or materially contributed to, the infringement of the *MLG* story as embodied in the Derivative Films, in that:

        (a)    all of the Defendants used, distributed, and/or exploited *SIK* in the United States and in foreign territories;

        (b)    all of the Defendants, including Viacom and its Indian Agents and Affiliates, subsidiaries, and others, produced, filmed, distributed, and edited *SIK* for domestic and foreign distribution;

        (c)    Viacom and the Viacom Defendants' affiliates and subsidiaries knowingly contributed to the distribution, promotion, and advertisement of *SIK* in both domestic and foreign territories after its production and manufacture, and, upon information and belief, induced infringement in the United States by providing financing, guarantees, and agreements for distribution of *SIK*;

        (d)    the Defendants further participated in the international distribution of *SIK* pursuant to license agreements, and/or distribution servicing agreements, and/or third party service agreements with or utilizing subsidiaries and affiliates of the Viacom Defendants, including the Indian Agents and Affiliates; and

        (e)    Upon information and belief, the Defendants' actions were performed with actual and constructive knowledge of Plaintiff's rights and interests.

    112.    All named Defendants are jointly and severally liable for contributory copyright infringement.

    WHEREFORE, Plaintiff is entitled to and prays for relief as follows:

    113.    A permanent injunction, pursuant to 17 U.S.C. § 502, enjoining the Defendants, their officers, agents, employees, licensees, assigns, distributors, and all persons acting in concert

with them, from engaging in such further violations of the Copyright Act;

114.    A permanent injunction enjoining the Defendants, their officers, agents, employees, licensees, assigns, distributors, sub-distributors, and all persons acting in concert with them, from engaging in or authorizing the production, reproduction, copying, use, distribution, exploitation, advertising, and promotion of *SIK*;

115.    Recovery from the Defendants of the damages, including pre-judgment interest it sustained and will sustain, and any income, gains, profits, and advantages obtained by the Defendants, their officers, agents, employees, licensees, assigns, distributors, sub-distributors, and all persons acting in concert with them, as a result of their wrongful acts committed in the United States, and those of their subsidiaries, affiliates, and distributors in foreign territories, alleged hereinabove pursuant to 17 U.S.C. § 504(b), in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial;

116.    The maximum statutory damages in the amount of $30,000.00 per infringement, and/or $150,000.00 per willful infringement pursuant to 17 U.S.C. § 504(c), or for such other amount as may be proper under 17 U.S.C. § 504(c). Plaintiff is further entitled to their attorney's fees and full costs pursuant to 17 U.S.C. § 505; and

117.    For such other and further relief and remedies available under the Copyright Act, 17 U.S.C. §§ 101 et seq., and/or for which the Court may deem just and proper, including punitive damages.

### THIRD CLAIM FOR RELIEF

**(Vicarious Copyright Infringement under 17 U.S.C. §§ 101 et seq.
Against All Defendants)**

118.    Plaintiff re-alleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 97 inclusive, as though fully set forth herein.

119.    All of the Defendants had the right, authority, and the ability to control or supervise the actions, failures, and omissions of their fellow Defendants, and other persons and entities, including the Indian Agents and Affiliates, their subsidiaries, affiliates, and distributors, domestic and foreign, which violated Plaintiff's copyright in the *MLG* story, and as embodied in the Derivative Films.

120.    The Defendants' acts and those of their agents, subsidiaries and/or affiliates, in the United States and in foreign territories, including copying, downloading, use, modification, reproduction, display marketing, distribution and exploitation of the elements of the *MLG* story, and as embodied in the Derivative Films, including without limitation, the ideas, expression of concepts, pattern, sequence, theme, text and plot contained therein and all derivatives thereof, constitute a violation of the United States Copyright Act, Title 17 U.S.C. §§ 501(a), 106(1) - 106(6), and all Defendants were acting as infringers within the meaning of 17 U.S.C. § 105(a).

121.    The Defendants had knowledge of Plaintiff's rights and interests in the *MLG* story, and as embodied in the Derivative Films during the development, production, distribution, and exploitation of *SIK*.

122.    All named Defendants obtained a direct financial interest, financial advantage, and/or economic consideration from the infringement in the United States and in foreign territories as a result of their infringing actions in the United States.

123.    All named Defendants are jointly and severally liable for infringement.

WHEREFORE, Plaintiff is entitled to and prays for relief as follows:

124.    A permanent injunction, pursuant to 17 U.S.C. § 502, enjoining the Defendants, their officers, agents, employees, licensees, assigns, distributors, and all persons acting in concert with them, from engaging in such further violations of the Copyright Act;

125.    A permanent injunction enjoining the Defendants, their subsidiaries, affiliates, officers, agents, employees, licensees and assigns, distributors, sub-distributors, and all persons acting in concert with them, both domestic and foreign, from engaging in or authorizing the production, copying, distribution and/or exploitation of *SIK*;

126.    Recovery from the Defendants of the damages, including pre-judgment interest Plaintiff sustained and will sustain, and any income, gains, profits, and advantages obtained by the Defendants, their subsidiaries, affiliates, and distributors, domestic and foreign, as a result of their wrongful acts committed in the United States and in foreign territories alleged hereinabove pursuant to 17 U.S.C. § 504(b), in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial;

127.    The maximum statutory damages in the amount of $30,000.00 per infringement, and/or $150,000.00 per willful infringement pursuant to 17 U.S.C. § 504(c), or for such other amount as may be proper under 17 U.S.C. § 504(c). Plaintiff is further entitled to their attorney's fees and full costs pursuant to 17 U.S.C. § 505; and

128.    For such other and further relief and remedies available under the Copyright Act, 17 U.S.C. §§ 101 et seq., and/or for which the Court may deem just and proper.

### ON ALL CLAIMS FOR RELIEF

129.    For Plaintiff's reasonable costs and attorneys fees;

130.    For interest on all sums awarded Plaintiff; and

131.    For punitive damages.

## JURY TRIAL DEMANDED

Plaintiff hereby requests a trial by jury on each claim for relief alleged in the Complaint.

DATED this  4th  day of May, 2010

Respectfully Submitted,

Steven M. Hayes, Esq.
New York Bar No.: 2926
HANLY, CONROY, BIERSTEIN,
SHERIDAN, FISHER, HAYES, LLP
112 Madison Avenue
New York, NY 10016-7416
Ph: (212) 784-6414
Fx: (212) 784-6420
Email: shayes@hanlyconroy.com

and

Clay M. Townsend, Esq.
Florida Bar No.: 363375
Keith R. Mitnik, Esq.
Florida Bar No.: 436127
MORGAN & MORGAN, P. A.
Appearing Pro Hac Vice
20 N. Orange Avenue, Suite 1600
Orlando, FL 32802
Ph: (407) 418-2075
Fx: (407) 425-8171
Email: ctownsend@forthepeople.com

*Attorneys for Plaintiff*
*American Rights Management Company, LLC*

# <u>Exhibit List</u>

A.    *Madame La Gimp* by Damon Runyon

B.    Assignment of Copyright to Damon Runyon (June 5, 1931)

C.    Registration of a Claim to the Renewal of a Copyright (September 10, 1956)

D.    Certificate of Recordation of Transfer (July 7, 2000)

E.    Singh is Kinng English Language Subtitles